Bernard WILLIAMS, Appellant,

v.

William P. ROGERS, Secretary of State, et al., Appellees.

No. 71-1249.

United States Court of Appeals, Eighth Circuit.

Sept. 28, 1971.

Bruce B. Bair, Vogel, Bair & Brown, Mandan, N. D., for appellant.

Robert E. Kopp, Atty., L. Patrick Gray, III, Asst. Atty. Gen., Harold O. Bullis, U. S. Atty., Walter H. Fleischer, Atty., Dept. of Justice, Washington, D. C., for appellees.

Before HEANEY and STEPHEN-SON, Circuit Judges, and NEVILLE, District Judge.

STEPHENSON, Circuit Judge.

This case arises under the Military Bases in the Philippines Agreement,[1] hereinafter called "the Agreement." It has its genesis in the inadvertent transfer of Staff Sergeant Bernard Williams, an enlisted member of the United States Air Force, from Clark Air Base, the Philippines, to Minot Air Force Base, North Dakota, in November 1969. The transfer was in direct violation of Paragraph 5 of Article XIII of the Agreement in that the custody of Sergeant Williams had been entrusted by Philippine authorities to an authorized Air Force representative pending the trial of himself and two fellow airmen in the Court of First Instance of Pampanga and Angeles City, Fifth Judicial District, Branch IV, the Philippines, for the forcible abduction of Pelagia Malquisto, a 23-year old, unmarried, female Philippine national. We quote paragraph 5 in the margin.[2]

The Air Force, at the urging of the Deputy Secretary of Defense, sought, in March 1970, to reassign Sergeant Williams to his previous organization in the

1. T.I.A.S. No. 1775, as amended by Agreed Official Minutes to Article XIII thereof of the August 10, 1965, Revised Criminal Jurisdiction Arrangements, T.I.A.S. No. 5851.

2. Paragraph 5 of Article XIII of the Agreement provides:
"In all cases over which the Republic of the Philippines exercises jurisdiction, the custody of an accused member of the United States Armed Forces, civilian component, or dependent, pending investigation, trial and final judgment, shall be entrusted without delay to the commanding officer of the nearest base, who shall acknowledge in writing (a) that such accused has been delivered to him for custody pending investigation, trial and final judgment in a competent court of the Philippines and (b) that he will be made available to the Philippine authorities for investigation upon their request and (c) that he will be produced before said court when required by it. * * *."

Philippines. Thereupon, on April 8, 1970, Sergeant Williams instituted the present action against the Secretary of State, the Secretary of the Air Force, the Commander of the 810th Strategic Aerospace Division and the Base Commander of Minot Air Force Base in the District of North Dakota. He asked that the defendants be enjoined from transferring him to the Philippines. The complaint contains no specific allegation of jurisdiction.

Chief Judge Register issued a temporary restraining order April 8, 1970, and, on May 22, 1970, after hearing, a preliminary injunction enjoining the Air Force from returning Sergeant Williams to the Philippines pending a final determination on the merits. The defense, in February 1971, moved for summary judgment. Chief Judge Register, on May 10, 1971, ruled that the record disclosed no triable issues of material fact, sustained the motion for summary judgment, and ruled that Sergeant Williams was eligible for an immediate transfer to the Philippines.[3]

There is little dispute about the basic facts. Sergeant Williams, in August 1969, was arraigned in the Court of First Instance on the criminal charge of forcible abduction with attempted rape. Accordingly, and pursuant to paragraph 5 of Article XIII of the Agreement, the custody of Sergeant Williams was entrusted by Philippine authorities to Raymond L. Hodges, Lieutenant Colonel, United States Air Force, Chief, International Law Section. Lieutenant Colonel Hodges certified in writing that Sergeant

Williams "will be held ready to appear before a duly constituted investigation or a competent court of the Republic of the Philippines at such times and places as required * * *." A plea of not guilty was entered and trial proceedings commenced. These proceedings were in progress at the time of Sergeant Williams' transfer.

From the record before us it is revealed that the transfer was occasioned by a failure of communications between Sergeant Williams' detachment at Clark Air Base and his parent organization at Springfield, Virginia. Appropriate Air Force Regulations[4] require deferral of the permanent change of station of any airmen under charges and awaiting trial by Philippine criminal courts for a period of 6 months from the date such charges are preferred. When an airman is charged by Philippine authorities with the commission of a crime the procedure usually is for his detachment to place him on "Administrative Hold" so as to alert upper echelon personnel that he is not to be transferred. It is the deviation from this procedure which led to issuance by Sergeant Williams' parent organization of permanent change of station orders to return him to the United States for normal reassignment, notwithstanding the fact that Air Force officials had given a custody certificate to the Philippine authorities in accordance with paragraph 5 of Article XIII.

Disclosure of this error immediately induced the Republic of the Philippines to register a strongly worded protest with the United States Embassy in Ma-

---

3. Chief Judge Register's unreported memorandum sustaining the defense motion for summary judgment recites that the May 22, 1970 preliminary injunction issued because of the effect of Rule 19, Table 1–5, Air Force Manual 39–11, "which provided, inter alia, that an airman was not available for an overseas assignment when he has less than twelve months residency within the continental limits of the United States since the date of return from his last overseas tour. The effect of this regulation, in the opinion of this Court, was to render Sgt. Williams ineligible for transfer overseas until the latter part of

November 1970." Thus, in the view of Chief Judge Register, Sergeant Williams was eligible for transfer at any time subsequent to November 1970.

4. Air Force Manual 39–11, Table 1–5, Rule 6 as amended by Rule 8 appearing in change 13 and Rule 10 appearing in change 14, provides, in substance, that an airman awaiting ultimate disposition in a Philippine court is to be deferred from permanent change of station for a period of 6 months from the date the charges are brought.

nila. The Court of First Instance, the Honorable Ceferino S. Gaddi, delayed the trial of Williams and his fellow airmen pending Williams' return and entered an order holding Colonel Averill Holman, Commander, Clark Air Base, and Lieutenant Colonel Hodges in contempt for their failure to produce Sergeant Williams as promised in the custody certificate.[5]

■ With these facts and this complaint before us, we raise on our own the important question of federal court jurisdiction. We do so because of our obligation to satisfy ourselves as to our own jurisdiction and that of the District Court. Jackson v. Kuhn, 254 F.2d 555, 559–560 (8 Cir. 1958).

The two unpublished memorandum opinions of Chief Judge Register do not reveal the subject matter jurisdictional basis upon which he relied in reaching the merits of this dispute. This perhaps is because the question has not been heretofore raised, briefed or argued.

There is no specific allegation of subject matter jurisdiction in the complaint.[6] There is only the general allegation that "[t]he defendants, who are all representatives of the Executive Branch of Government of the United States, in attempting to illegally extradite and illegally transfer the plaintiff, a citizen of the United States of America, to the Phillippines [sic], are acting in deprivation of the civil rights, privileges and immunities of the plaintiff as secured by the Constitution and Laws of the United States." This language, with its reference to civil rights, privileges and immunities, would seem to indicate reliance upon the cause of action created by 42 U.S.C.A. § 1983. If a claim properly has been stated under § 1983, then 28 U.S.C.A. § 1343 confers original jurisdiction on the District Court.

■ § 1983, of course, creates the remedy to redress a deprivation, under color of State law, of any right, privilege or immunity secured by the Constitution and laws of the United States. That statute, however, is directed by its very terms to *State* wrongdoing, and there are specific holdings and other observations which indicate that it reaches State action only. See, for example, Wheeldin v. Wheeler, 373 U.S. 647, 652, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963); Long v. Parker, 390 F.2d 816, 819 (3 Cir. 1968); Norton v. McShane, 332 F.2d 855, 862 (5 Cir. 1964), and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 276 F.Supp. 12, 13–14 (E.D. N.Y.1967), aff'd 409 F.2d 718 (2 Cir. 1969), rev'd on other grounds, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). We note, also, Mr. Justice Harlan's statement in *Bivens* that neither § 1983 nor § 1343 is supportive of federal jurisdiction over a claim for damages against federal officers acting under color of their authority. 403 U.S., at 398, N. 1, 91 S.Ct. 1999.[7]

■ The principles that the Federal courts are courts of limited jurisdiction, possessing only the power that the

---

5. Lieutenant Colonel Hodges and Colonel Holman were each sentenced to pay a fine of 1,000 pesos and to be imprisoned to be released only upon their compliance with their undertaking in the custody receipt. It does not appear, however, that the sentences were executed.

6. See C. Wright, Law of Federal Courts, § 7, at 15–17 (2nd Ed. 1970).

7. There are other cases and comments supportive of our conclusion that § 1983 provides no relief in cases where, as here, it is alleged that federal governmental action transcends constitutional limits. See United States v. Faneca, 332 F.2d 872, 874 (5 Cir. 1964), cert. denied, 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965); Gregoire v. Biddle, 177 F.2d 579, 581 (2 Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950), construing the predecessor of the present § 1983; Blaze v. Moon, 315 F.Supp. 495, 496 (S.D.Texas 1970); Sullens v. Carroll, 308 F.Supp. 311, 312 (M.D.Fla. 1970); Johnson v. District of Southern Missouri Commissioners, 258 F.Supp. 669, 670 (W.D.Mo.1966), aff'd per curiam, 368 F.2d 184 (8th Cir. 1966); Ellis v. Parker, 257 F.Supp. 207, 208 (M.D.Pa.1966); and Broome v. Simon, 255 F.Supp. 434, 440 (W.D.La.1965).

Congress expressly has conferred upon them by statute, Lockerty v. Phillips, 319 U.S. 182, 187, 63 S.Ct. 1019, 87 L.Ed. 1339 (1943); that parties cannot waive lack of subject matter jurisdiction whether by express consent or by conduct, Chicago, Burlington & Quincy Railway Co. v. Willard, 220 U.S. 413, 421, 31 S.Ct. 460, 55 L.Ed. 521 (1911); and that where jurisdiction does not exist the court, whether trial or appellate, shall dismiss the action sua sponte, Louisville & Nashville R. R. Co. v. Mottley, 211 U. S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908), are all well established and, of course, have general application here. Nevertheless, and although the issue here has caused us some distress, we feel that Chief Judge Register was correct in reaching the merits of this dispute. We say this because of our conviction that, on the basis of these facts, a properly drafted complaint could have invoked the judicial power entrusted the District Court by 28 U.S.C.A. § 2241(c) (3).[8]

§ 2241(a) empowers a United States District Court to issue writs of habeas corpus on behalf of persons within its jurisdiction. § 2241(c) (3) expressly makes the writ available to test the validity, under the Constitution, laws or treaties of the United States, of executive, judicial or private restraint, detention or confinement. Peyton v. Rowe, 391 U.S. 54, 58, 88 S.Ct. 1549, 20 L.Ed. 2d 426 (1968). Our focus here, then, is on the nature of the illegality alleged and the type of restraint, if any, imposed.

■ The complaint asserts a deprivation of rights assured by the Constitution, laws and treaties of the United States. Such an allegation, we feel, is sufficient for the purposes of the statute. And, since it is no longer necessary to be under actual physical restraint in order to obtain habeas relief, our task in this regard is only to determine whether there are imposed upon Sergeant Williams "conditions which significantly confine and restrain his freedom." Jones v.

8. We view 28 U.S.C.A. § 1331(a) as an additional possible source of federal jurisdiction. Since this action is one which could be said to arise under the Constitution, laws or treaties of the United States, § 1331(a) confers original jurisdiction if the amount in controversy exceeds the sum or value of $10,000, exclusive of interest and costs.

We are aware, of course, of the pitfalls associated with seeking to determine the amount in controversy where, as here, the right sought to be protected is one that is personal in nature and therefore not readily susceptible of precise pecuniary valuation. We note, however, that the Supreme Court has yet specifically to hold that § 1331 is available only to litigants seeking either the recovery of monetary damages or the judicial protection of property rights to which a specific dollars-and-cents value can be assigned. But cf. Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

If we chose to turn the jurisdictional issue here on § 1331(a), we would be impressed with, on the one hand, the character of the right sought to be enforced, see, for example, Kurtz v. Moffitt, 115 U.S. 487, 498, 6 S.Ct. 148, 29 L.Ed. 458 (1885); First National Bank of Youngstown v. Hughes, 106 U.S. 523, 1 S.Ct. 489, 27 L.Ed. 268 (1882), and Barry v. Mercein, 46 U.S. (5 How.) 103, 120,

12 L.Ed. 70 (1847) and, on the other, the facts that Sergeant Williams would, on conviction, lose his present position in the Air Force as well as his freedom to earn money for the period of time during which he is incarcerated so that, assuming the opportunity to do so, he might well be able to establish that the extent of the injury to be prevented by this action, see Pennsylvania R. Co. v. City of Girard, 210 F.2d 437, 439 (6 Cir. 1954) and Hedberg v. State Farm Mutual Automobile Insurance Co., 350 F.2d 924, 929 (8 Cir. 1965), consists of a monetary loss which is readily transferable into an amount exceeding $10,000. In any event, we perhaps would find ourselves reluctant to conclude that such facts as those present here established to a legal certainty that the amount in controversy was really less than the jurisdictional minimum. Saint Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288–289, 58 S.Ct. 586, 82 L.Ed. 845 (1930). See Berk v. Laird, 429 F.2d 302, 306 (2 Cir. 1970) and Friedman v. International Ass'n of Machinists, 95 U.S.App.D.C. 128, 220 F.2d 808, 810 (1955), cert. denied, 350 U.S. 824, 76 S.Ct. 51, 100 L.Ed. 736 (1955). See also Fein v. Selective Service System Local Board No. 7, 430 F.2d 376, 384 (2 Cir. 1970), Lumbard, Ch. J., dissenting.

Cunningham, 371 U.S. 236, 243, 83 S.Ct. 373, 377, 9 L.Ed.2d 285 (1963). See also Carafas v. LaVallee, 391 U.S. 234, 237–240, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968).

From a careful study and analysis of Sergeant Williams' present posture it seems at once apparent that the attempt of the Air Force to return him to the Philippines has subjected him to certain restraints distinguishable from those shared by his fellow servicemen generally. The Air Force, of course, claims the right to assert plenary jurisdiction over Sergeant Williams and the power to command his return forthwith to the Philippines for trial. He perhaps would now be there if the District Court had not entered the appropriate orders directing that he not be removed from the district during the pendency of this action. And, the fact that the Air Force is desirous of shipping him to trial in the Philippines represents the likelihood of future confinement and restraint there. The present Air Force attempt to reassign and the promise of future confinement in the Philippines establish to our satisfaction that Sergeant Williams is subject to more than normal military restraint and that his freedom of physical mobility is thereby significantly restricted. For us, these factors equate with a constructive restrictive custody which meets the "in custody" requisite of the statute. Although their fact situations are perhaps pertinently distinguishable, we regard the following cases as supportive of this conclusion. United States ex rel. Meadows v. State of New York, 426 F.2d 1176, 1179 (2 Cir. 1970); Hammond v. Lenfest, 398 F.2d 705, 710–711 (2 Cir. 1968); Donigan v. Laird, 308 F.Supp. 449, 451 (D.Md.1969); and Benitez-Manrique v. Micheli, 305 F.Supp. 334, 337 (D.Puerto Rico 1969).

We therefore hold that § 2241(c) (3) is an appropriate procedural vehicle for testing the propriety and validity of the governmental action called into question here and that the District Court's subject matter jurisdiction was properly, albeit inartfully, invoked. See also 28 U.S.C.A. § 1361 and Ashe v. McNamara, 355 F.2d 277, 282 (1 Cir. 1965). But compare Rural Electrification Admin. v. Northern States Power Co., 373 F.2d 686, 694–695, n. 14 (8 Cir. 1967) and 1962 U.S.Code Cong. and Adm.News, pp. 2784–2787, 2788–2790.

This takes us to a consideration of the merits. The entire case pivots on the right of the Air Force to correct its inadvertent November 1969 transfer of Sergeant Williams by now reassigning him to Clark Air Base.[9] This, in turn, would seem to depend at least in part, upon the scope and effect of the relevant provisions of the Agreement. Sergeant Williams stops short of suggesting that we disregard the current attitude and teaching of the Supreme Court that we refrain from interjecting ourselves into matters properly within the area of military discretion and that we therefore not, as a general rule, accord judicial review to a specific, independent duty assignment. Orloff v. Willoughby, 345 U.S. 83, 92–95, 73 S.Ct. 534, 97 L.Ed. 842 (1953). He asserts, however, that this is so only in the context of internal military matters involving the good faith judgment of military personnel concerning duty assignments; that there is no military discretion here, within the proscription of *Orloff*; that his reassignment orders are based solely on diplomatic considerations; and that the Air Force and the State Department, in seeking to return him to the Philippines, are, in effect, unlawfully extraditing him at the request of Philippine authorities. He

---

9. It might be persuasively argued that the transfer to Minot was void ab initio. The supporting affidavits of Air Force personnel closely connected with the transfer establish to our satisfaction that the transfer would not have been accomplished had the "administrative hold" procedure been followed. Nevertheless, and because the nature and force of Sergeant Williams' attack goes to his presence at Minot, irrespective of how or why he was sent there, we are not inclined to rest our decision on this ground.

stresses the absence of a treaty of extradition between this country and the Republic of the Philippines; he maintains that he will not receive a trial according to due process of law if he is returned for trial in the Philippine court, and he urges that, in any event, a probable cause hearing must be held before he lawfully can be transferred back to the Philippines. The response of the defense is that the scope and breadth of the Agreement is such that it authorizes and commands Sergeant Williams' prompt return to the Philippines.

Although we would not ordinarily assume to revise the duty orders of those lawfully in the service, we recognize that the gist of Sergeant Williams' arguments are directed to matters which seemingly transcend the heart and penumbra of *Orloff*. We are therefore willing to entertain the merits of this appeal solely on that basis.

### I.

The Agreement, signed at Manila March 14, 1947, was specifically authorized by joint resolution of the Congress June 29, 1944.[10] It clearly embodies a comprehensive scheme for the establishment of military bases in the Republic of the Philippines with a view to insuring the territorial integrity of the Philippines, the mutual protection of the United States and the Philippines, and the maintenance of peace in the Pacific. These important military purposes are not to be overlooked nor peremptorily brushed aside.

Article XIII, as amended,[11] is an integral provision of the Agreement. It provides specific jurisdictional and procedural guidelines for the arrest, trial and custody of American Armed Forces personnel accused of committing criminal offenses on Philippine soil. Agreements with features of the kind involved here are by no means novel and we have no difficulty in concluding that this one represents a valid and appropriate exercise of legislative and executive authority.[12]

### II.

We recognize, and, of course, we must follow, the still live holding of the Supreme Court in the case, Valentine v. United States ex rel. B. Coles Neidecker, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936), that the executive possesses no power to extradite fugitive criminals except such as is conferred by treaty or by Act of Congress.

In *Valentine*, three Americans fled Paris to escape arrest there on charges stemming from certain financial dealings. The crimes charged were ones made extraditable under the treaty of extradition concluded between this country and France in 1909. That treaty authorized the extradition of fugitives from one country who were found in the other, but expressly excepted the citizens of both from its terms. Nevertheless, the French Consul, upon learning that the three fugitives were in New York City, secured from a United States Commissioner warrants commanding their ar-

---

10. Pub.L. 380, § 2, 58 Stat. 626 provides:
 "After negotiation with the President of the Commonwealth of the Philippines, or the President of the Filipino Republic, the President of the United States is hereby authorized by such means as he finds appropriate to withhold or to acquire and to retain such bases, necessary appurtenances to such bases, and the rights incident thereto, in addition to any provided for by the Act of March 24, 1934, as he may deem necessary for the mutual protection of the Philippine Islands and of the United States."

11. Agreed Official Minutes to Article XIII, effected by exchange of notes signed at Manila August 10, 1965.

12. Compare Wilson v. Girard, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed. 1544 (1953). In a per curiam opinion the Court there approved the Japanese Status of Forces Agreement, an executive agreement promulgated pursuant to a treaty. The Military Bases in the Philippines Agreement is, of course, an unratified executive agreement formulated pursuant to a concededly valid delegation of legislative authority.

rest. The three were arrested in due course and committed to the custody of the city police commissioner pending surrender to France. By writs of habeas corpus, they attacked the legality of their arrest and detention on the ground that the treaty specifically excluded United States citizens from its reach. The District Court denied the writs in an unpublished order. On appeal the Second Circuit reversed, one judge dissenting. 81 F.2d 32 (2 Cir. 1936).

In affirming the Second Circuit, Mr. Chief Justice Hughes stressed, 299 U.S., at 8–9, 57 S.Ct. 100, that neither France nor the United States were required, under the terms of the treaty, to deliver up it own citizens; that there is no executive discretion to surrender a fugitive criminal to a foreign government, unless that discretion is specifically conferred by law; and that the power to provide for extradition must be supported by a grant of authority by Congress or by the terms of a treaty. He concluded that "as the treaty with France fails to grant the necessary authority, the President is without power to surrender the respondents." 299 U.S. at 18, 57 S.Ct. at 106. He noted that "[w]hatever may be the power of the Congress to provide for extradition independent of treaty, that power has not been exercised save in relation to a foreign country or territory 'occupied by or under the control of the United States.'"[13] p. 9 of 299 U.S., p. 102 of 57 S.Ct. He noted, too, that "[w]here treaties have provided for the extradition of persons without exception, the United States has always construed its obligation as embracing its citizens." p. 7 of 299 U.S., p. 102 of 57 S.Ct.

*Valentine,* is said by Sergeant Williams to provide the framework within which the principal issue of the present case must be resolved. But, it seems clear to us that the holding there requires only that there be a showing of some authority, whether in the form of congressional dictate or policy, or the provisions of an existing treaty, to provide a legitimate basis for the surrender of fugitives from justice by this country to another. Our question here, then, is whether the Agreement, resting as it does on the delegation of legislative authority, could provide such a basis.

■■■ It is our view that the Military Bases in the Philippines Agreement of 1947, as later amended in 1965 meets the fiat of *Valentine,* insofar as applicable here, and that it authorizes and compels the prompt return of Sergeant Williams to the Philippines. We note that the Joint Resolution giving rise to the Agreement entrusted the President with broad powers to withhold, acquire and retain such military bases as he deemed necessary for the mutual protection of this country and the Philippines. We regard the authority to negotiate criminal jurisdiction arrangements as being necessarily implicit in such an expansive delegation of authority. And, we think that once the President is properly found to possess the power to negotiate jurisdictional arrangements of the sort present here, it is not impermissible also to find that he has the correlative power to enforce the obligations of our servicemen undertaken pursuant thereto. We emphasize, also: (a) The obvious interest of the military in securing the custody of those of its personnel who are charged with the commission of crimes by Philippine authorities pending their trial; (b) The impact and adverse effect that an open and well-publicized breach of the solemn obligations imposed on commanding officers by the custodial provisions of Article XIII has upon the reputation and integrity of American Servicemen stationed in the Philippines and upon the military mission and purposes of our bases there; (c) Our conviction that custodial provisions of the kind involved here can have present and future meaning and signifi-

13. See 18 U.S.C.A. § 3185.

cance only if Armed Forces supervisory personnel are deemed to possess the power to correct administrative errors of the kind that occurred here. (d) Our feeling that the benefit to Sergeant Williams in being permitted to remain on base and in American custody pending the final disposition of the Philippine proceedings against him produced a concomitant obligation to report and appear when required to do so and to remain responsive to the curative orders of superior officers if, as here, a mistake should occur through inadvertence and oversight.

■ In this posture and by these standards, Sergeant Williams has little room within which to maneuver on this appeal. It is undisputed that he enjoyed the right and privilege of remaining with his detachment during the Philippine court proceedings; he concedes that he was orally informed by Lieutenant Colonel Hodges that he was to be placed on "Administrative Hold"; and he does not dispute the defense contention that he executed, on October 17, 1969, a written acknowledgment to the effect that he was to appear in the Court of First Instance on January 16, 1970, the next hearing date in his trial proceedings. All of this in the aggregate leads us to decide that Sergeant Williams is not being unlawfully extradited and that he is obligated to promptly return to the Philippines as ordered.

### III.

We are not persuaded, as Sergeant Williams would have us be, that he cannot receive in the Philippine courts a trial according to due process of law. Neither are we persuaded by his suggestion that he is entitled to a probable cause hearing before he can be returned for trial.

■ Sergeant Williams intimates that Philippine judicial procedures fail to guarantee his fundamental due process rights. This argument would possess more appeal were it not for the safeguards embodied in paragraph 9 of Article XIII. It is there provided that American servicemen accused of committing civilian offenses on Philippine soil shall have, inter alia, the right to a speedy trial, the right to confront witnesses; the right to counsel, the right to a competent interpreter, and the right to have the trial conducted under the watchful eye of a representative of the United States Government. We feel that these safeguards substantially mitigate the potential unfairness thought by some scholars to inhere in foreign prosecutions.[14] And, we deem it pertinent to observe that Sergeant Williams is being tried to an experienced court who, as best we can tell from the cold record, has demonstrated proper concern for correctness of procedure and for the assurance of a fair and impartial trial for all the defendants.[15] Furthermore, it appears from our examination of the Court of First Instance record that Sergeant Williams and his co-defendants have to date received capable representation from their Philippine counsel. For us, these factors dispositively weigh against the due process contentions of Sergeant Williams.

■ We think, finally, that Sergeant Williams is not entitled to the probable cause hearing he demands. We note that he is being returned pursuant to a special agreement which neither imposes nor contemplates such a requirement. In the absence of such a requirement, the wisdom of the agreement and the details thereof are matters exclusive-

---

14. Note, 57 Georgetown Law Journal 1097 (1969).

15. There are, to be sure, points of unsureness and discrepancy in the testimony of Miss Malquisto; there is little in the way of corroborative medical and identification testimony; there has been some delay in the disposition of the case; and Judge Gaddi undoubtedly is aware of the monetary interest Miss Malquisto possesses in the outcome of the case. We feel, however, that all of this will be taken into account by Judge Gaddi at the appropriate time.

ly within the domain of the Executive and Legislative Branches. *Girard, supra*, 354 U.S., at 530, 77 S.Ct. at 1409.

We find no error in Chief Judge Register's ruling. Our order dissolving the injunction now in effect will be stayed for a period of 15 days in order to permit plaintiff-appellant to secure further stay from the Supreme Court pending petition for certiorari.

Affirmed.[16]

NEVILLE, District Judge (concurring).

I concur and join in the decision of this case, and in Judge Stephenson's opinion with the exception of that part discussing the jurisdiction. I believe no real question of federal jurisdiction is presented. The defendants here are all employees of the federal government, i. e., the Secretary of State, Secretary of the Air Force and the Commander of the Air Force Base in North Dakota. The Federal Courts have subject matter jurisdiction over any suit brought against a Federal employee "acting in his official capacity or under color of legal authority" and 28 U.S.C. § 1391(e) states as a matter of venue that any such suit may be brought in any judicial district in which a defendant resides, or the cause of action arose, or where plaintiff resides. This action was brought · in North Dakota where plaintiff is and has been stationed and the cause of action arose. Indeed, were such an action as this to be brought in a State court under 28 U.S.C. § 1442(a) (1) and (3) and § 1442(a) it is per se removable to the Federal Court. The court in my opinion need make no further inquiry concerning jurisdiction and is not required to analogize the case to a writ of habeas corpus.

On the merits, I thoroughly agree with Judge Stephenson's well written opinion.

16. Compare United States ex rel Stone v. Robinson, 431 F.2d 548 (3 Cir. 1970) and Buskers v. Seamans, Civil Action No. 1208–70 (D.N.J.1970), stay denied,

No. 19,270 (3 Cir. September 18, 1970), stay denied by Supreme Court, September 19, 1970.