# Seizure of Foreign Ships on the High Seas
# Pursuant to Special Arrangements

The United States has authority under international law to enter into agreements to stop, search, and detain foreign vessels on the high seas that are suspected of trafficking in illicit drugs.

The United States may limit its jurisdiction over a foreign flag vessel seized on the high seas, and the vessel may be returned to the flag state at its request without compliance with domestic forfeiture law.

Where the United States is authorized under international law to exercise its police powers to detain ships on behalf of their flag state, such detention does not constitute a taking under the Fifth Amendment. However, where a ship is seized concurrently on behalf of the United States for violation of U.S. customs laws, a claimant is entitled to a prompt adjudication of his rights in the seized property.

February 19, 1980

## MEMORANDUM OPINION FOR THE DEPUTY LEGAL ADVISER, DEPARTMENT OF STATE

This responds to your inquiry whether there would be any legal objection to the boarding, search, detention, bringing to a U.S. port and release to the flag state of a foreign vessel believed to be engaged in trafficking in illicit drugs by U.S. authorities pursuant to an agreement with that flag state to act on its behalf.[1] You attached a "Draft Note" that would be the model for such agreements. You also asked more specifically: (1) whether such a seizure would be a taking under the Fifth Amendment; (2) whether due process would require a hearing before the vessel was returned to the flag state; and (3) whether there would be any legal consequences if the United States held the vessel for a prolonged period without instituting condemnation or forfeiture proceedings. We have concluded that your Draft Note would allow the proper exercise by the U.S. of jurisdiction over foreign vessels on the high seas if we have the flag state's permission. However, we believe that it will also permit assertion of concurrent jurisdiction by United States courts. The parties must decide which country will prosecute before the vessel is seized. Unless the vessel is clearly seized in the name of the flag state, the mandatory forfeiture proceedings required by our customs law provide a forum for third-party claims against the

---

[1] We do not, except where indicated, address questions arising from efforts to enforce our domestic law.

vessel. *See, e.g.,* 19 U.S.C. §§ 1602-1604 (1976); 49 U.S.C. §§ 781-782 (1976); 21 U.S.C. § 881(d), (f) (1976).

## I. Authority of the United States to Enter into Special Arrangements to Stop and Search a Foreign Vessel on the High Seas

Flag states have continuing jurisdiction over their vessels on the high seas. This is a basic principle of international law, I Oppenheim, International Law § 264 (7th ed. 1948), which was recognized most recently in Article 6 of the Convention on the High Seas, Apr. 29, 1958, 13 U.S.T. 2313, T.I.A.S. No. 5200. Although traditionally international law has precluded assertion of jurisdiction on the high seas over a vessel registered to another state, there are exceptions, usually found in treaties, to this rule.[2] Such agreements come within a special category of pacts in which countries grant or waive jurisdiction over crimes that occur in their territory. More familiar examples of such pacts are jurisdictional agreements regarding military personnel. *See Wilson* v. *Girard,* 354 U.S. 524 (1957) (United States and Japan); *Holmes* v. *Laird,* 459 F.2d 1211, 1216 n.32 (D.C. Cir. 1972); *Williams* v. *Rogers,* 449 F.2d 513 (8th Cir. 1971), *cert. denied,* 405 U.S. 926 (1972); Agreement Between the Parties To the North Atlantic Treaty Regarding the Status of Their Forces, June 19, 1951, 4 U.S.T. 1792, T.I.A.S. No. 2846 (NATO SOFA).

The President has Congress' express authority to enter into special arrangements, including those that will aid the United States' effort to curtail drug traffic. Article 35 of the Single Convention on Narcotic Drugs, 1961, 18 U.S.T. 1408, T.I.A.S. No. 6298 (Single Convention), which was ratified by the Senate in 1967, requires that signatories:

> (a) Make arrangements at the national level for co-ordination of preventive and repressive action against the illicit traffic; . . .
>
> (b) Assist each other in the campaign against the illicit traffic in narcotic drugs;

---

[2] During Prohibition, for example, the United States and England signed the Convention between the United States and Great Britain for prevention of smuggling of intoxicating liquors, 43 Stat. 1761. American ships were allowed to "search a private [English] ship within a certain distance outside American territorial waters, and if there were reasonable cause for doing so, might take it in for adjudication by the American courts." J. Brierly, The Law of Nations 240 (5th ed. 1956). Virtually identical treaties were signed with a number of other nations. *Id.* The North Sea Fisheries Convention of 1852 "gave the signatory states rights of search over one another's fishing vessels, but the adjudication of offenses against the fishing regulations was reserved for the state of an offending vessel." *Id. See* J. Starke, An Introduction to International Law 235-36 (5th ed. 1963) (1887 Convention respecting the Liquor Traffic in the North Sea; Interim Convention of Feb. 9, 1957 for the Conservation of North Pacific Fur Seal Herds).

A more dramatic example of assertion of jurisdiction on the high seas is the Intervention on the High Seas Act, 33 U.S.C. §§ 1471 *et seq.,* designed to implement the International Convention Relating to Intervention on the High Seas in Cases of Oil Pollution Casualties, Apr. 29, 1958, 26 U.S.T. 765, T.I.A.S. No. 8068. The Secretary of the Treasury is authorized to intervene during an oil spill to mitigate damages by whatever steps are necessary, including destruction of the ship that is leaking oil.

(c) Co-operate closely with each other and with the competent international organizations of which they are members with a view to maintaining a co-ordinated campaign against the illicit traffic; . . .

Article 28 provides: "The Parties shall adopt such measures as may be necessary to prevent the misuse of, and illicit traffic in, the leaves of the cannabis plant." [3] In a further effort to promote international cooperation in the control of narcotics, Congress has given the President broad powers to negotiate agreements in this area.

It is the sense of the Congress that effective international cooperation is necessary to put an end to the illicit production, smuggling, trafficking in, and abuse of dangerous drugs. In order to promote such cooperation, the President is authorized to conclude agreements with other countries to facilitate control of the . . . transportation, and distribution . . . controlled substances. . . . Notwithstanding any other provision of law, the President is authorized to furnish assistance to any country or international organization, on such terms and conditions as he may determine, for the control of . . . smuggling of, and traffic in, narcotic and psychotropic drugs.

22 U.S.C. § 2291(a)(1976). [4]

Congress clearly recognized, as the Supreme Court did in *Cook* v. *United States,* 288 U.S. 102 (1933), that the Executive could negotiate special jurisdictional arrangements with foreign nations which would *prevent* the exercise of our law. When it passed the Anti-Smuggling Act of 1935, Congress acted to protect agreements like the British-American Liquor Treaty. *See* note 2. It added 19 U.S.C. § 1581(h):

[T]his section shall not be construed to authorize or require any officer of the United States to enforce any law of the United States upon the high seas upon a foreign vessel in contravention of any treaty with a foreign government enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce upon said vessel upon the high seas the laws of the United States except as such authorities are or may otherwise be enabled or permitted under special arrangement with such foreign government. [5]

---

[3] There are similar provisions in the Single Convention covering the opium poppy, the coco bush, and their products. The Single Convention is mentioned as indicative of U.S. legislative policy in 21 U.S.C. § 801(7).

[4] We note that the President must file semi-annual reports with Congress on these agreements. 22 U.S.C. § 2291(b) (1976).

[5] *See also* H.R. Rep. No. 868, 74th Cong., 1st Sess. 5, 8 (1935); S. Rep. No. 1036, 74th Cong., 1st Sess. 9, 13 (1935); 79 Cong. Rec. 9075 (1935) (remarks of Rep. Hill). An almost identical provision involving revenue laws (antismuggling) can be found at 19 U.S.C. § 1701(b).

It also added 19 U.S.C. § 1587(a):

> [A]ny vessel . . . which, being a foreign vessel . . . is permitted by special arrangement with a foreign government to be so examined . . . may at any time be boarded and examined by any officer of the customs . . . [who] may also bring the vessel into the most convenient port of the United States to examine the cargo. . . .[6]

Thus, the Executive Branch has the authority to stop, board, search, and detain a foreign vessel pursuant to a special agreement with the flag state.[7]

## II. The Legal Consequences of Holding a Vessel Seized on Behalf of a Flag State in U.S. Ports for Return to the Flag State

Assuming that the vessel is held in the United States at the request of the flag state, the flag state, on whose behalf the United States is acting, would not lose jurisdiction over the vessel when the ship is moved into U.S. territory. The special arrangement delineates the jurisdictional rules covering the vessel and by its terms the United States may waive any jurisdictional rights over it.[8] *See* discussion at III, *infra.* Therefore the vessel may be returned to the flag state at its request without compliance with domestic forfeiture law.

The Supreme Court recognized that the United States could limit its jurisdiction by treaty in *Cook v. United States,* 288 U.S. 102 (1933). Libels filed against a British ship were ordered dismissed because the ship had been seized further from shore than the British-American Liquor Treaty allowed. "The Treaty fixes the conditions under which a 'vessel may be seized . . .' . . . Our Government, lacking power to seize, lacked power, because of the Treaty, to subject the vessel to our laws." 288 U.S. at 121.

We recommend that the Draft Note make explicit that the United States has no independent jurisdiction when a vessel is seized on behalf of its flag state. Otherwise, third parties could argue that American courts have concurrent jurisdiction to hear their claims. The results of such an assertion of jurisdiction would be quite significant. First, as indicated below, third parties have rights once a boat has been seized—

---

[6] Coast Guard officers are customs officers. 14 U.S.C. § 143 (1976). The Coast Guard's authority to enforce American law, 14 U.S.C. § 89(a) (1976), is not a limitation on any powers they may have under other laws. 14 U.S.C. § 89(c) (1976).

[7] We note that there may be administrative problems with the Draft Note. In order to seize a ship for violation of a flag state's laws, the members of the Coast Guard patrol will have to know what constitutes a violation of each flag state's drug laws. Whether this education is provided by seminars or brochures, it will involve time and expense. Regulations will also be needed to insure that the proper procedure is used in each case: *i.e.,* inclusion of the Venezuelan equivalent of *Miranda* warnings, should they exist. This would protect the flag state's interest in proper prosecution.

[8] In *Williams, supra,* the agreement had "specific jurisdictional procedural guidelines for the arrest, trial and custody of American Forces personnel accused of committing criminal offenses on Philippine soil." 449 F.2d at 520.

and automatically forfeited—under U.S. customs laws. Second, if the flag state decides it no longer desires to prosecute and the United States therefore decides to do so, there may be problems with using evidence obtained in the flag state by its officials. For example, in the Ninth Circuit, evidence produced by a "joint venture" between United States and Mexican authorities was suppressed because the *Mexican* officials failed to give the American defendants *Miranda* warnings. *United States* v. *Emery*, 591 F.2d 1266, 1267–68 (9th Cir. 1978). "The constitutional safeguards of *Miranda* should not be circumvented merely because the interrogation was conducted by foreign officials in a foreign country." 591 F.2d at 1268. *See also Brulay* v. *United States*, 383 F.2d 345, 349 n.5 (9th Cir.), *cert. denied* 389 U.S. 986 (1967) (discussing application of Fifth Amendment to statement given to foreign officials). An early decision as to which country will prosecute will insure that proceedings are handled uniformly and that the proper pretrial procedures are followed.

Under our hypothesis, a ship suspected of violating the flag state's laws is seized on behalf of the flag state by the United States. Must there be a hearing to determine whether there is probable cause to believe that the ship was involved in a violation of the flag state's law prior to return of the ship? Or may the ship be returned forthwith?

Where the ship is seized pursuant to a special agreement for a suspected violation of the flag state's law, we do not believe that a hearing is necessary. "[W]e think that once the President is properly found to possess the power to negotiate [criminal] jurisdictional arrangements . . . , the wisdom of the agreement and the details thereof are matters exclusively within the domain of the Executive and Legislative Branches." *Williams* v. *Rogers*, 449 F.2d 513, 521, 522–23 (8th Cir. 1971), *cert. denied*, 405 U.S. 926 (1972).[9] In *Williams*, the court of appeals held that an American serviceman was not entitled to a probable cause hearing before he was returned to the Philippines for a rape prosecution. "[Sgt. Williams] is being returned pursuant to a special agreement which neither imposes nor contemplates such a requirement." *Id.* at 522.

Where the United States is exercising the flag state's jurisdiction on the high seas—acting as custodian—and there has been an express renunciation of U.S. jurisdiction, we believe that relief for third parties would have to be obtained in the flag state's courts, not in ours. The flag state has the same exclusive criminal jurisdiction over its ships on the high seas, subject to treaty, that it has over them when they are in the flag state's waters.[10] Just as the flag state can make jurisdictional

---

[9] The language is taken from *Wilson* v. *Girard*, 354 U.S. 524, 530 (1957) (*per curiam*). In *Wilson*, the Supreme Court upheld certain jurisdictional arrangements of an administrative agreement between Japan and the United States.

[10] A law that, as one of your hypotheses suggested, automatically transferred the right to the vessel's possession or title to the flag state would not strengthen the flag state's criminal jurisdiction
Continued

410

agreements with the United States over the exercise of jurisdiction within the flag state's territory, we believe that it can also enter into special arrangements regarding its criminal jurisdiction over its vessels on the high seas.

This reasoning is supported by the logic of decisions such as *Holmes* v. *Laird*, 459 F.2d 1211, 1217 (D.C. Cir. 1972). Two American soldiers who had been convicted of rape in West Germany fled to the United States. They filed habeas corpus petitions, charging, among other things, that because their trial in West Germany had been unfair,[11] it was unconstitutional for the U.S. Government to return them to serve their prison sentence.

> The argument, in essence, is that the turnover of an American citizen for service of a sentence imposed in culmination of an unfair foreign trial is a governmental involvement which the Constitution does not tolerate. . . .
>
> To be sure, "no agreement with a foreign nation can confer power on . . . any . . . branch of Government, which is free from the restraint of the Constitution." And no more than the supremacy of the Constitution over treaties like NATO SOFA can its supremacy over executive augmentations like the Supplementary Agreement with the Federal Republic be doubted. Nor can it be doubted that out Nation's performance as well as its making of international compacts must observe constitutional mandates. The fatal difficulty in appellants' position, however, is that these considerations are beside the point.
>
> Here we deal, not with an American prosecution in an American tribunal at home or abroad, but with a West German trial in a West German court—a trial for offenses under West German law allegedly committed in West Germany against a West German citizen. Obviously, the constitutional provisions appellants invoke exerted no force of their own upon the Federal Republic in that exercise of its sovereignty. And while, of course, American officials having custody of appellants are fully subject to constitutional commands, *it must be remembered that the contemplated surrender is the precise response required of the United States by its treaty commitments to the Federal Republic.* The Constitution plays no part in this case

---

over the vessel, since that jurisdiction is already complete. However, it would provide an additional argument to defeat any attempt by a third party to persuade an American court to assert concurrent jurisdiction.

[11] They claimed that their trial had violated various provisions of the NATO SOFA agreement, including confrontation of their accuser and appointment of counsel of their choice. 459 F.2d at 1214.

unless somehow it operates to negate those commitments in the circumstances appellants allege.

459 F.2d at 1217–18 (footnotes omitted; emphasis added). Likewise the appellants' argument that the court should not enforce the NATO SOFA agreement because West Germany had allegedly breached it was unpersuasive.

> The same result is plainly dictated here, where appellants trace the rights they claim to the provisions of an international agreement the enforcement mechanism of which is diplomatic recourse only. NATO SOFA . . . is explicit that '[a]ll differences . . . shall be settled by negotiations without recourse to any outside jurisdiction'. . . . In sum, intervention by an American court into the matters of which appellants complain is foreclosed by the very terms of the document from which the rights insisted upon are said to spring.

459 F.2d at 1222 (footnote omitted). Similarly, NATO SOFA was held to deny American jurisdiction in an action by Germans against American naval forces under the Public Vessels Act. *Shafter* v. *United States*, 273 F. Supp. 152 (S.D.N.Y. 1967). "There is nothing unfair or irrationally discriminatory in recognition by our government of *exclusive* jurisdiction in a civilized foreign State over disputes concerning events and people within the territory of that State." 273 F. Supp. at 157 (emphasis added).

We also believe that where the ship is seized on behalf of the flag state, there is no taking within the meaning of the Fifth Amendment. The United States is not claiming to own or have rights in the flag state's ships—it has arrested them. More than a hundred years ago, the President refused to allow three American ships to leave New York City because he believed that their owners planned to use them in a private expedition against Nicaragua.

> It was contended for the petitioner . . . that the act of the President . . . was the act of the state, and a taking of the private property of the petitioner for public use. But we think the facts found do not support this claim. They showed that the vessels were prevented from leaving the harbor of New York, and thus were, in the language of the statute, and under it, *"detained."* And we think, . . . that this was neither *a taking* nor *a use,* as those words are used in the Constitution, where they imply and require the exercise by the state of a proprietary right, for a greater or less time in the property taken. Then the detention was at the most an arrest under the statute, which was for the case "due process of law."

> And an arrest under process of law never makes a contract, and cannot without malice, which is not shown here, make a tort. Therefore the loss and inconvenience the petitioner has suffered are *damnum absque injuria,* which is not a ground for an action at law.

*Graham* v. *United States,* 2 Ct. Cl. 327, 340 (1866) (emphasis in original). As was stated explicitly in a later case,

> The distinction between an exercise of eminent domain power that is compensable under the fifth amendment and an exercise of the police power is that in a compensable exercise of the eminent domain power, a property interest is taken from the owner and applied to the public use because the use of such property is beneficial to the public[;] and in the exercise of the police power, the owner's property interest is restricted or infringed upon because his continued use of the property is or would otherwise be injurious to the public welfare.

*Franco-Italian Packing Co.* v. *United States,* 128 F. Supp. 408, 414 (Ct. Cl. 1955).

Similarly, the United States' refusal to grant clearance to a Dutch ship during World War I was held not to constitute a taking. *Royal Holland Lloyd* v. *United States,* 73 Ct. Cl. 722, 732–33 (1932). However, the Court of Claims, acting under a special jurisdictional grant, held that the United States had had no authority under international law to detain the ship of a neutral nation. 73 Ct. Cl. at 744–45. Therefore, damages were assessed to compensate the owners. Under the proposed agreements, the United States *will* have the authority under international law to exercise its police powers to detain ships on behalf of their flag state. *See also Hurtado* v. *United States,* 410 U.S. 578, 588–89 (1973) (detention of a material witness not a taking because witness has public duty to testify); *Finks* v. *United States,* 395 F.2d 999, 1003–05 (Ct. Cl.), *cert. denied* 393 U.S. 960 (1968) (impoundment by U.S. Agency for International Development in Brazil of cars owned by American foreign service officers in order to prevent sale in violation of Brazilian customs law not a taking).

### III. The Consequences of Seizing a Ship for Violations of U.S. Customs Laws

You have also asked what the legal consequences might be if a court were to find that a ship had been seized concurrently on behalf of the United States.

Violations of customs law are required by law to be reported immediately to the customs officer for referral to the United States Attorney. 19 U.S.C. §§ 1602, 1603, 1604. If the vessel is held for more than a few

months, it is very possible that if forfeiture proceedings are instituted, a court would return the property to its registered owner. Delay in instituting forfeiture proceedings has been held repeatedly to constitute a violation of due process.[12]

> There is now a course of decisions holding that if the delay between the seizure and commencement of district court proceedings is substantial, unexcused and unreasonable, such delay will, on due process grounds, itself bar the government from proceeding further. How much delay has that effect seems to be a mixed question of fact and law to be decided in light of the facts of the particular case.

*United States* v. *Eight(8) Rhodesian Stone Statues,* 449 F. Supp. 193, 204 (C.D. Cal. 1978). A requirement of "reasonable dispatch" was read into § 1603 by the court in *United States* v. *One(1) Douglas A–26B Aircraft, etc.,* 436 F. Supp. 1292, 1296 (S.D. Ga. 1977). "Where the delay operates to deny claimant his constitutional and statutory rights to prompt adjudication of rights in the seized property, the forfeiture action must be dismissed." *Id.*[13]

Technically, "the forfeiture takes effect immediately upon the commission of the [illegal] act. . . ." *United States* v. *Stowell,* 133 U.S. 1, 16 (1889). The subsequent court proceedings merely vest title official in the Government.[14] There is no taking if the boats are seized under U.S. customs law—since the vessel would be automatically forfeited at the moment of seizure (if not earlier, when the first criminal act was committed). Forfeiture proceedings are not takings under our Constitution. *Calero-Toledo* v. *Pearson Yacht Leasing Co,* 416 U.S. 663, 680–90 (1974); *United States* v. *One 1975 Mercedes 280S,* 590 F.2d 196, 198–99

---

[12] This may be due in equal part to the increased pressure for a hearing and speedy determination of rights mandated by *Fuentes* v. *Shevin,* 407 U.S. 67 (1972), and to the judiciary's desire to mitigate the harshness of forfeiture proceedings, especially when it is clear that the owner is innocent of any wrong doing.

[13] *See also White* v. *Acree,* 594 F.2d 1385, 1388-9 (10th Cir. 1979) (must be referred "promptly and within short time limits"); *Ivers* v. *United States,* 581 F.2d 1362, 1367-8 (9th Cir. 1978); *United States* v. *One 1970 Ford Pickup, Serial No. F10YRG53615,* 564 F.2d 864, 866 (9th Cir. 1977) (11 months); *Stypmann* v. *City and County of San Francisco,* 557 F.2d 1338, 1343-4 (9th Cir. 1977) (5 days) (towed car); *United States* v. *One Motor Yacht Named Mercury,* 527 F.2d 1112, 1114 (1st Cir. 1975) (12½ months); *States Marine Lines, Inc.* v. *Shultz,* 498 F.2d 1146, 1155 (4th Cir. 1974) (1 year); *Sarkisian* v. *United States,* 472 F.2d 468, 472 (10th Cir.), *cert. denied,* 414 U.S. 976 (1973) (9 months); *United States* v. *Eight(8) Rhodesian Stone Statues,* 449 F. Supp. 193 (C.D. Ca. 1978) (16 months); *United States* v. *One(1) Douglas A–26B Aircraft, etc., supra,* (9½ months); *Boston* v. *Stephens,* 395 F. Supp. 1000, 1005 (S.D. Ohio 1975) (6 months); *United States* v. *One 1971 Opel G.T., etc.,* 360 F. Supp. 638, 640–42 (C.D. Ca. 1973) (7 months). *But see United States* v. *One 1973 Buick Riviera Automobile,* 560 F.2d 897, 901 (8th Cir. 1977) (5-month delay permissible); *United States* v. *One 1971 Volvo 2-Door Sedan,* 393 F. Supp. 843, 846-7 (C.D. Ca. 1975) (2-month delay permissible).

[14] *See Calero-Toledo* v. *Pearson Yacht Leasing Co.,* 416 U.S. 663, 683–84 (1974); *United States* v. *Stowell,* 133 U.S. 1, 17 (1890); *Thacher's Distilled Spirits,* 103 U.S. 679, 682 (1880); *Henderson's Distilled Spirits,* 81 U.S. (14 Wall.) 44, 56-59 (1871); *The Palmyra,* 25 U.S. (12 Wheat.) 1, 14-15 (1827); *United States* v. *One 1973 Buick Riviera Automobile,* 560 F.2d 897, 900 (8th Cir. 1977). Thus, innocent purchasers of the vessel are not protected.

414

(6th Cir. 1978); *Associates Investment Co.* v. *United States,* 220 F.2d 885, 888 (5th Cir. 1955).

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
