Nathaniel HOLMES et al., Appellants,

v.

Melvin LAIRD, as Secretary of the United States Department of Defense, et al.

No. 71-1518.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 14, 1971.

Decided March 24, 1972.

Messrs. Nathaniel R. Jones, New York City, of the bar of the Supreme Court of Ohio, and James I. Meyerson, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. J. Francis Pohlhaus, Washington, D. C., was on the brief, for appellants.

Mr. Robert E. Kopp, Atty., Dept. of Justice, with whom Mr. L. Patrick Gray, III, Asst. Atty. Gen., Messrs. Thomas A. Flannery, U. S. Atty., at the time the

brief was filed, and Walter H. Fleischer, Atty., Dept. of Justice, were on the brief, for appellees.

Mr. Frank D. Reeves, Washington, D. C., was on the brief for the National Conference of Black Lawyers, as amicus curiae.

Before ROBINSON and MacKINNON, Circuit Judges, and GOURLEY,* Senior District Judge for the Western District of Pennsylvania.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal presents for resolution an issue of potential concern to American servicemen stationed within the territories of our allies under the North Atlantic Treaty,[1] and similarly to the many others assigned to military outposts in other parts of the world. The question is whether a court of the United States is empowered to entertain a claim of illegality in the conviction of two American soldiers in the Federal Republic of Germany with a view to enjoining their surrender for service of their sentences.[2] We have carefully examined the problem in the light shed by the relevant precedents, which most numerously are controlling upon us. We conclude that the question must be answered in the negative.

I

At the center of the controversy are reciprocal criminal-jurisdiction provi-

sions subscribed to by the nations comprising the North Atlantic Treaty Organization. They are embodied in the NATO Status of Forces Agreement (NATO SOFA)[3] and, with but minor variations, they extend to the Federal Republic of Germany by virtue of a subsequent multilateral agreement.[4] They are designed to avoid jurisdictional clashes when military personnel[5] of one country—the "sending State"[6]—are assigned to peacetime duty[7] within the borders of another—the "receiving State."[8] Jurisdiction may be either exclusive or concurrent,[9] and is concurrent when the misconduct charged amounts to a crime under the law of each.[10] NATO SOFA specifies that

In cases where the right to exercise jurisdiction is concurrent the following rules shall apply:

(a) The military authorities of the sending State shall have the primary right to exercise jurisdiction over a member of a force or of a civilian component in relation to

(i) offences solely against the property or security of that State, or offences solely against the person or property of another member of the force or civilian component of that State or of a dependent;

(ii) offences arising out of any act or omission done in the performance of official duty.

(b) In the case of any other offence the authorities of the receiving

---

* Sitting by designation pursuant to 28 U.S. C. § 294(d) (1970).

1. Apr. 4, 1949, 63 Stat. 2241 (1949), T.I. A.S. No. 1964 (effective Aug. 24, 1949).

2. Appellants also present two related contentions. We treat them in note 59, *infra*.

3. Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, June 19, 1951, [1953 pt. 2] 4 U.S.T. 1792, T.I.A.S. No. 2846 (effective Aug. 23, 1953), hereinafter cited "NATO SOFA".

4. See text *infra* at notes 15–17.

5. Civilian components accompanying forces as well as military personnel are included, as are dependents of members of forces or

civilian components. See text *infra* at note 11.

6. The "sending State" is "the Contracting Party to which the force belongs," and the "receiving State" is "the Contracting Party in the territory of which the force or civilian component is located, whether it be stationed there or passing in transit." NATO SOFA, *supra* note 3, art. I, para. 1(d)–(e).

7. NATO SOFA, *supra* note 3, art. XV.

8. See note 6, *supra*.

9. See NATO SOFA, *supra* note 3, art. VII.

10. NATO SOFA, *supra* note 3, art. VII, para. 1.

State shall have the primary right to exercise jurisdiction.[11]

These specifications are accompanied by others relating to waiver of jurisdiction [12] and provisional custody of the accused by the sending nation.[13] And, importantly for appellants' case, NATO SOFA surrounds prosecutions by receiving nations with fair-trial safeguards approximating some but not all of those constitutionally mandated for criminal proceedings in the United States Courts:

Whenever a member of a force or civilian component or a dependent is prosecuted under the jurisdiction of a receiving State he shall be entitled—

(a) to a prompt and speedy trial;

(b) to be informed, in advance of trial, of the specific charge or charges made against him;

(c) to be confronted with the witnesses against him;

(d) to have compulsory process for obtaining witnesses in his favour,

if they are within the jurisdiction of the receiving State;

(e) to have legal representation of his own choice for his defence or to have free or assisted legal representation under the conditions prevailing for the time being in the receiving State;

(f) if he considers it necessary, to have the services of a competent interpreter; and

(g) to communicate with a representative of the Government of the sending State and, when the rules of the court permit, to have such a representative present at his trial.[14]

West Germany, as an occupied country in 1951, was not an original party to NATO SOFA, but became one in 1958. The Supplementary Agreement bringing that about,[15] together with the Signature of Protocol thereto, wrought some changes respecting waiver and custody [16] but none significantly affecting this litigation. NATO SOFA's fair-trial

11. NATO SOFA, *supra* note 3, art. VII, para. 3.

12. NATO SOFA, *supra* note 3, art. VII, para 3(c).

13. NATO SOFA, *supra* note 3, art. VII, para. 5(c).

14. NATO SOFA, *supra* note 3, art. VII, para. 9. See also art. VII, para. 8 (double jeopardy).

15. Status of Forces in the Federal Republic of Germany, Aug. 3, 1959, [1963 pt. 1] 14 U.S.T. 531, T.I.A.S. No. 5351 (effective July 1, 1963), hereinafter cited "Supplementary Agreement."
In 1955, West Germany's status as occupied territory was dissolved and membership in NATO was conferred upon the Federal Republic. Article 1 of the Protocol on the Termination of the Occupation Regime in the Federal Republic of Germany, Oct. 23, 1954, [1955 pt. 4] 6 U.S.T. 4117, T.I.A.S. No. 3425 (effective May 5, 1955), incorporated, with amendments, the status-of-forces provisions of the Convention on the Rights and Obligations of Foreign Forces and Their Members in the Federal Republic of Germany, May 26, 1952, [1955 pt. 4] 6 U.S.T. 4278, T.I.A.S. No. 3425 (effective May 5, 1955), thus enabling the United States to con-

tinue temporarily the exercise of criminal jurisdiction over its servicemen. Article 1 of the Protocol also incorporated the Convention on Relations Between the Three Powers and the Federal Republic of Germany, May 26, 1952, [1955 pt. 4] 6 U.S.T. 4278, T.I.A.S. No. 3425 (effective May 5, 1955), and in Schedule 1 amended *inter alia*, its Article 8 to provide that the temporary status-of-forces arrangement would endure only "until the entry into force of new arrangements setting forth the rights and obligations of the forces" in West Germany and that "[t]he new arrangements will be based on" NATO SOFA, "supplemented by such provisions as are necessary in view of the special conditions existing in regard to the forces stationed in the Federal Republic." The Senate ratified the Protocol, 101 Cong.Rec. 4232–33 (1955), and so the two incorporated conventions as amended, thus authorizing negotiation by the Executive Branch and its concurrence in the Supplementary Agreement with the Federal Republic which came later. Compare Wilson v. Girard, 354 U.S. 524, 527–529, 77 S.Ct. 1409, 1 L. Ed. 1544 (1957).

16. See Supplementary Agreement, *supra* note 15, arts. 19, 22.

guarantees [17] were left standing without any change whatsoever.

## II

Appellants are American citizens serving in the United States Army. In July, 1970, while stationed with the Eighth Infantry Division in West Germany, they were arrested on charges of attempted rape and related offenses. Appellants tell us that the matter was investigated by their military superiors, who decided that the evidence did not warrant prosecution. The Federal Republic of Germany recalled a waiver of its jurisdiction,[18] however, and appellants were later indicted. In harmony with the Supplementary Agreement,[19] they were remitted to American military custody while the case proceeded in the West German courts.

Trial in the District Court (Landgericht) in Bad Kreuznach culminated in convictions and sentences to imprisonment for three years. A subsequent appeal to the Federal Supreme Court (Bundesgerichtshof) was denied, whereupon their convictions became final under German law. It then became the Army's responsibility under the provisions of the Supplementary Agreement to turn appellants over to the Federal Republic.[20]

Shortly prior to pronouncement of the appellate decision, appellants left West Germany without authorization and returned to the United States. Thereafter they surrendered to Army officials, in whose custody they now are, and then initiated the present litigation in the District Court. In their complaint, as amended, they claimed deprivations of rights secured to them by NATO SOFA,[21] by principles of international law, and by the Constitution of the United States. They were materially prejudiced because they were not afforded a speedy trial, they allege, because they were charged in July, 1970, but were not tried until the following December. They were not furnished counsel of their choice, they say, because their request for an American civilian attorney was denied. Representation by their German counsel was ineffective, they aver, because the language barrier and incomplete relay by their court-appointed interpreter impeded communication. They were not permitted confrontation, they declare, by their accuser because they were excluded while the prosecutrix testified, or by another witness whose hearsay was admitted into evidence. And they lacked a full and accurate transcript and resultantly a fair appeal, they state, because a verbatim trial record was not provided.[22] Their prayer, in substance, was for an injunction restraining the American military from surrendering them to the Federal Republic and for a judgment declaratory of the invalidity of such surrender.[23]

The District Court, after a hearing at which it rejected appellants' proffer of evidence to support their factual theories, denied their application for a preliminary injunction, and granted appellees' motion to dismiss for failure of the complaint to state a justiciable cause of

---

17. See text *supra* at note 14.

18. Pursuant to Supplementary Agreement, *supra* note 15, art. XIX, para. 3.

19. Supplementary Agreement, *supra* note 15, art. XXII, para. 3.

20. Supplementary Agreement, *supra* note 15, art. XXII, para. 3.

21. See text *supra* at note 14.

22. Appellants charge additionally that an identification and rulings on witnesses' credibility at trial are suspect.

23. The specific prayers of appellants' amended complaint, aside from a request for a temporary restraining order, were for orders "[p]reliminarily and permanently enjoining the Defendant parties [and those in privity or concert] from transferring the Plaintiffs back to West Germany and surrendering them to German authorities," and for a judgment "[d]eclaring the Defendant parties' acts to transfer the Plaintiffs back to West Germany and to surrender them to German authorities as illegal and unconstitutional, in violation of rights secured to them by the Fifth and Sixth Amendments to the United States Constitution and the NATO Status of Forces Agreement."

action. The most significant feature of the court's holding was that even if appellants' allegations were proven, it was beyond the power of the judiciary to order corrective action. This appeal followed.

### III

■ Surely, in situations such as this, "[t]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them we must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations." [24] And undeniably, matters "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." [25] It is not surprising, then, that many questions arising in connection with our treaties with other governments have been held to be non-

justiciable.[26] For "[n]ot only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views." [27]

■ That is not to say that every dispute touching our foreign relations falls outside the province of the judiciary.[28] As the Supreme Court has characterized its decisions, they "seem invariably to show a discriminating analysis of the particular question posed, in terms of history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." [29] Even in controversies affected in some degree by a treaty with a foreign country—areas very likely off-limits for the judiciary [30]—the courts may in a particular context have a legitimate and useful function to perform.[31] In

---

24. Romero v. International Terminal Operating Co., 358 U.S. 354, 383, 79 S.Ct. 468, 486, 3 L.Ed.2d 368 (1959).

25. Harisiades v. Shaughnessy, 342 U.S. 580, 588–589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952).

26. As examples, what nation has sovereignty, *de jure* or *de facto*, over particular territory, Jones v. United States, 137 U.S. 202, 212, 11 S.Ct. 80, 34 L.Ed. 691 (1890); Williams v. Suffolk Ins. Co., 38 U.S. (13 Pet.) 415, 420, 10 L.Ed. 226 (1839); the boundaries of territories ceded by treaty, as determined by executive and legislative construction, United States v. Reynes, 50 U.S. (9 How.) 127, 153–154, 13 L.Ed. 74 (1850); Garcia v. Lee, 37 U.S. (12 Pet.) 511, 516–518, 520–521, 9 L.Ed. 1176 (1838); Foster v. Neilson, 27 U.S. (2 Pet.) 253, 307–310, 7 L.Ed. 415 (1829); whether the representatives of a contracting power had authority to make a particular treaty provision, Doe ex dem. Clark v. Braden, 57 U.S. (16 How.) 635, 657–658, 14 L.Ed. 1090 (1853); whether a treaty is inoperative for fraud or duress on a contracting power, United States v. Old Settlers, 148 U.S. 427, 468, 13 S.Ct. 650, 37 L.Ed. 509

(1893); whether a contracting power remains able to perform its obligations thereunder, Clark v. Allen, 331 U.S. 503, 514, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947); Terlinden v. Ames, 184 U.S. 270, 282–290, 22 S.Ct. 484, 46 L.Ed. 534 (1902); whether treaty provisions should, in view of changed circumstances, be enforced, Johnson v. Gearlds, 234 U.S. 422, 443–447, 34 S.Ct. 794, 58 L.Ed. 1383 (1914). See also Michigan Cent. R.R. v. Slack, 100 U.S. 595, 598–599, 25 L.Ed. 647 (1880). And, for the numerous cases holding that the courts cannot command either contracting power to perform treaty provisions, see notes 61–62, *infra*.

27. Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962).

28. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); Baker v. Carr, *supra* note 27, 369 U.S. at 211, 82 S.Ct. 691.

29. Baker v. Carr, *supra* note 27, 369 U.S. at 211–212, 82 S.Ct. at 707.

30. See note 26, *supra*.

31. See Baker v. Carr, *supra* note 27, 369 U.S. at 211–214, 82 S.Ct. 691.

our view, however, this court has no such role in this case.[32]

Our starting point is a basic fact and an elementary proposition. All essential elements of the crimes in question were committed within the territory of the Federal Republic of Germany. From that it follows that, save only as modified by some other agreed-to alignment, West Germany's power to try and convict for those offenses was complete.[33] "A sovereign nation," the Supreme Court declares, "has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction."[34] "The jurisdiction of the nation, within its own territory, is necessarily exclusive and absolute; it is susceptible of no limitation, not imposed by itself."[35] And "[a]ll exceptions . . . to the full and complete power of a nation within its own territories

must be traced up to the consent of the nation itself. They can flow from no other legitimate source."[36]

 Thus, had appellants been present in West Germany as militarily-unattached civilians, an exercise of West German criminal jurisdiction over them would indubitably have been appropriate. It seems equally clear that, absent some countervailing international agreement, such an exertion remained unaffected by their status as American soldiers stationed there. We are advertent to the observation in Schooner Exchange v. McFaddon[37] that "[t]he grant of a free passage . . . implies a waiver of all jurisdiction over the troops, during their passage,"[38] but read it in context as a proposition based on real, though not expressly-conferred, consent of the host nation emanating from the obvious necessities of the situation.[39] We are also advertent to similar expressions in cases involving troops occupying hostile

32. Surrender of American servicemen for foreign trial pursuant to status-of-forces agreements has received consistent judicial approval. See Wilson v. Girard, *supra* note 15, 354 U.S. at 530, 77 S.Ct. 1409 (with Japan); Cozart v. Wilson, 98 U.S. App.D.C. 437, 438, 236 F.2d 732, 733, judgment vacated as moot, 352 U.S. 884, 77 S.Ct. 126, 1 L.Ed.2d 82 (1956) (with Japan); United States ex rel. Stone v. Robinson, 431 F.2d 548 (3d Cir. 1970) (with Japan); Williams v. Rogers, 449 F.2d 513 (8th Cir. 1971) (with the Philippines); Smallwood v. Clifford, 286 F. Supp. 97 (D.D.C.1968), judgment vacated as moot, No. 22,053 (D.C. Cir. May 14, 1969) (with South Korea). See also May v. Wilson, 153 F.Supp. 688, 691 (D.D.C.1956) (with Japan). We have been referred to no case in which such a surrender has been judicially disapproved.

33. For treatments of the problem of criminal jurisdiction over visiting military forces under international law, see Re, The NATO Status of Forces Agreement and International Law, 50 Nw.U.L.Rev. 349 (1955); Schwartz, International Law and The NATO Status of Forces Agreement, 53 Colum.L.Rev. 1091 (1953); Note, Criminal Jurisdiction Over American Armed Forces Abroad, 70 Harv.L. Rev. 1043 (1957).

34. Wilson v. Girard, *supra* note 15, 354 U.S. at 529, 77 S.Ct. at 1412. See, to the same effect, Reid v. Covert, 354 U.S. 1, 15, n. 29, 48–49, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

35. Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812).

36. *Id.*

37. *Supra* note 35.

38. 11 U.S. (7 Cranch) at 140, 3 L.Ed. 287.

39. See Restatement of Foreign Relations Law of the United States § 57, Reporter's Note 2, § 58 (1965). As there explained:

> Rules prescribing the exercise of jurisdiction over forces are derived from the necessities of the force in accomplishing its mission or purpose. In the case of a force in passage through the territory of another state, the purposes of both the sending and territorial states are to expedite and facilitate a rapid transit in order that the force may proceed on its mission. The rule determining exercise of jurisdiction over forces in passage is designed to prevent delay in the territory of the territorial state.

*Id.* § 58, comment *a.*

or conquered territory,[40] where obviously there can be "no question of implying waivers of jurisdiction from consent to the presence of the forces." [41] We think it now fully established that the plenary criminal authority of a friendly host nation during peacetime is undiminished by the bare fact that the accused is a member of a military force stationed there.[42] Certainly there is no immunity from local prosecution contrary to the explicit terms of an agreement—like NATO SOFA—purporting to define jurisdictional areas for host and visiting countries alike.[43]

## IV

In this light we examine appellants' objections, addressing first the contention that their surrender to the Federal Republic of Germany would infringe rights secured to them by the Constitution. That, as we understand their thesis, not because the Constitution operates extraterritorially to surround American citizens tried for crime by foreign governments,[44] but because it does extend to those who on behalf of the United States would effect the surrender. The argument, in essence, is

that the turnover of an American citizen for service of a sentence imposed in culmination of an unfair foreign trial [45] is a governmental involvement which the Constitution does not tolerate. On the premise that their West German trial was unfair in the respects charged in this case,[46] appellants lay claim to judicial process to shield the asserted constitutional violation.[47]

To be sure, "no agreement with a foreign nation can confer power on . . . any . . . branch of Government, which is free from the restraint of the Constitution." [48] And no more than the supremacy of the Constitution over treaties like NATO SOFA [49] can its supremacy over executive augmentations like the Supplementary Agreement with the Federal Republic be doubted.[50] Nor can it be doubted that our Nation's performance as well as its making of international compacts must observe constitutional mandates.[51] The fatal difficulty in appellants' position, however, is that these considerations are beside the point.

Here we deal, not with an American prosecution in an American tribunal at

40. See Dow v. Johnson, 100 U.S. 158, 165, 25 L.Ed. 632 (1880) ; Coleman v. Tennessee, 97 U.S. 509, 515, 24 L.Ed. 1118 (1879).

41. Restatement of Foreign Relations Law of the United States § 57, Reporter's Note 2 (1965).

42. Wilson v. Girard, supra note 15, 354 U.S. at 529–530, 77 S.Ct. 1409 ; Cozart v. Wilson, supra note 32, 98 U.S.App. D.C. at 438, 236 F.2d at 733. See also other cases cited supra note 32.

43. Wilson v. Girard, supra note 15, 354 U.S. at 529–530, 77 S.Ct. 1409 ; Cozart v. Wilson, supra note 32, 98 U.S.App.D.C. at 438, 236 F.2d at 733.

44. See text supra at notes 33–43.

45. We are unclear as to whether appellants would measure fairness by the Constitution or by the fair-trial standards of NATO SOFA, see text supra at note 14, although we presume the former. This makes no difference since by either standard the transpirations alleged by appel-

lants would have rendered the trial unfair.

46. See text supra following note 21.

47. See also Comment, Due Process Challenge to the Korean Status of Forces Agreement, 57 Geo.L.J. 1097 (1969).

48. Reid v. Covert, supra note 34, 354 U.S. at 16, 77 S.Ct. at 1230.

49. Id. at 17, 77 S.Ct. 1222 ; United States v. Minnesota, 270 U.S. 181, 207–208, 46 S.Ct. 298, 70 L.Ed. 539 (1926) ; Geofroy v. Riggs, 133 U.S. 258, 267, 10 S.Ct. 295, 33 L.Ed. 642 (1890) ; The Cherokee Tobacco (Boutinot v. United States), 78 U.S. (11 Wall.) 616, 621, 20 L.Ed. 227 (1871).

50. Wilson v. Girard, supra note 15, 354 U.S. at 530, 77 S.Ct. 1409 ; Reid v. Covert, supra note 34, 354 U.S. at 17 n. 33, 77 S.Ct. 1222.

51. Wilson v. Girard, supra note 15, 354 U.S. at 530, 77 S.Ct. 1409, 1 L.Ed. 1544 ; Reid v. Covert, supra note 34, 354 U.S. at 16–19, 77 S.Ct. 1222, 1 L.Ed.2d 1148.

home or abroad,[52] but with a West German trial in a West German court—a trial for offenses under West German law allegedly committed in West Germany against a West German citizen. Obviously, the constitutional provisions appellants invoke exerted no force of their own upon the Federal Republic in that exercise of its sovereignty.[53] And while, of course, American officials having custody of appellants are fully subject to constitutional commands, it must be remembered that the contemplated surrender is the precise response required of the United States by its treaty commitments to the Federal Republic. The Constitution plays no part in this case unless somehow it operates to negate those commitments in the circumstances appellants allege.

It is evident that if appellants' point were to be entertained, an in-depth examination of the West German trial record would become an indispensable forerunner of any endeavor to resolve their claims on the merits. We need not pause to reflect on the difficulties—practical or otherwise—of such an undertaking, for appellants' contention that the Constitution has the effect asserted is doomed, we think, by the Supreme Court's holding in Neely v. Henkel,[54] An American citizen there contended that a federal statute authorizing extradition compliably with an applicable treaty to a foreign country or territory occupied by or under the control of the United States was "unconstitutional and void in that it does not secure to the accused, when surrendered to a foreign country for trial in its tribunals, all of the rights, privileges, and immunities that are guaranteed by the Constitution to persons charged with the commission in this country of crime against the United States."[55] Reference, in support of this position, was made not only to particular provisions of the Constitution but also "generally to the fundamental guaranties of life, liberty, and property embodied in that instrument."[56] The Court found the argument wanting:

The answer to this suggestion is that those provisions have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country.

In connection with the above proposition, we are reminded of the fact that the appellant is a citizen of the United States. But such citizenship does not give him an immunity to commit crime in other countries, nor entitle him to demand, of right, a trial in any other mode than that allowed to its own people by the country whose laws he has violated and from whose justice he has fled. When an American citizen commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States.[57]

---

52. See O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969); McElroy v. United States ex rel. Guagliardo, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed. 2d 282 (1960); Grisham v. Hagan, 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 279 (1960); Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960); Reid v. Covert, supra note 34; United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

53. See text supra at notes 33–43.

54. 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901).

55. Id. at 122, 21 S.Ct. at 307.

56. Id.

57. Id. at 122–123, 21 S.Ct. at 307. We recognize, of course, that the statute involved in Neely made prerequisite an order of a federal judge based on evidence establishing probable cause of guilt, and similarly to NATO SOFA required the demanding state to "secure to such person a fair and impartial trial." Id. at 112, 123, 21 S.Ct. at 303. These circumstances in no wise affected the Court's holding that substantial counterparts of

As we view *Neely*, it governs the decision on the point under discussion. What we learn from *Neely* is that a surrender of an American citizen required by treaty for purposes of a foreign criminal proceeding is unimpaired by an absence in the foreign judicial system of safeguards in all respects equivalent to those constitutionally enjoined upon American trials. We do not believe that that teaching as been eroded by time,[58] nor that the slight factual differences between the pretrial extradition there and the postconviction surrender here removes the instant situation from *Neely's* ambit. We conclude, then, that the Constitution erects no barrier to appellants' surrender to the Federal Republic in conformity with NATO SOFA and the Supplementary Agreement.

## V

Remaining for consideration is appellants' contention that any obligation imposed upon the United States by NATO SOFA and the Supplementary Agreement to surrender them to the Federal Republic of Germany was negated by events allegedly transpiring at their West German trial.[59] Assuming

---

American constitutional rights need not be available at the foreign trial. The "fair and impartial trial" statutorily guaranteed, the Court explained, was "not necessarily a trial according to the mode prescribed by this country for crimes committed against its laws, but a trial according to the modes established in the country where the crime was committed, provided such trial be had without discrimination against the accused because of his American citizenship." *Id.* at 123, 21 S.Ct. at 307.

58. In Wilson v. Girard, *supra* note 15, the Supreme Court, in sustaining the propriety of surrender of an American serviceman to Japan for criminal trial pursuant to an international agreement similar to those involved here, made no reference in its opinion to the procedures prevailing in the Japanese courts although their variance from those obtaining in American courts is well known. Indeed, notwithstanding the serviceman's specific claim that the absence of due process in the Japanese judicial system would deprive him of a fair trial in the Japanese courts, Brief for Petitioner-Appellee in Nos. 1103 and 1108 at 42–49, the Court found "no constitutional or statutory barrier" to the surrender. 354 U.S. at 530, 77 S.Ct. 1409. See also Gallina v. Fraser, 278 F.2d 77, 78–79 (2d Cir. 1960).

59. Appellants also submit two subsidiary arguments. One is that their situation is beyond the scope of the requirement NATO SOFA imposes upon the United States to surrender servicemen to the Federal Republic. The duty to surrender, like the other duties NATO SOFA enjoins, relates to members of a visiting "force" and, with a proviso not relevant here, "force" is defined as "the personnel belonging to the land, sea or air armed forces of one Contracting Party *when in the territory of* another Contracting Party in the North Atlantic Treaty area in connection with their official duties." NATO SOFA, art. I, para. 1(a) (emphasis supplied). Appellants say that, as persons no longer in West Germany, they are not members of a "force" to which NATO SOFA applies. The answer is that appellants were in West Germany as members of a "force" at the time of the commission of the offenses with which they were charged. West German jurisdiction then attached, and neither it nor the correlative American obligation to surrender was affected by appellants' subsequent unauthorized departure for the United States. Compare Williams v. Rogers, *supra* note 32, 449 F.2d at 520. Cf. Autry v. Wiley, 440 F.2d 779, 803 (1st Cir. 1971).

The other argument is that appellants are surrenderable only pursuant to the terms of an extradition treaty. It is certainly the law that the power of the Executive Branch to invade one's personal liberty by handing him over to a foreign government for criminal proceedings must be traced to the provisions of an applicable treaty. Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 7–9, 57 S.Ct. 100, 81 L.Ed. 5 (1936); Factor v. Laubenheimer, 290 U.S. 276, 287, 54 S.Ct. 191, 78 L.Ed. 315 (1933); United States v. Rauscher, 119 U.S. 407, 411–414, 7 S.Ct. 234, 30 L.Ed. 425 (1886). But NATO SOFA—a treaty in every sense of the word—makes just such a stipulation, as does the Supplementary Agreement with the Federal Republic, which derives full efficacy from the provisions of still another treaty. See note 18, *supra*, and accompanying text. That no further authorization is prerequisite is evident from the cases where, in comparable situations, surrenders have received

the position that those events violated the Federal Republic's agreement to afford American servicemen specific rights in criminal prosecutions,[60] the argument is that the breach exonerated the United States from compliance with any covenants of its own. We advert once again, without consideration, to the formidable problem encountered when an American court is asked to review the proceedings at a foreign trial for the purpose of ascertaining whether it has discharged its responsibilities. Beyond that, we deem it established that even if appellants' underlying premise were correct, we lack power to make the decision they solicit.

The contention appellants make is not new; on the contrary, it has ofttimes been advanced, and it has uniformly been rejected. Not only has it consistently been held that the courts cannot command the United States to take action assertedly necessary to performance of a treaty,[61] but attempts to secure judicial adjudications that nonperformance by the other party to the treaty relieved the United States from its own obligations have met the same fate.[62]

Quite early in the Nation's history the Supreme Court, in Schooner Exchange v. McFadden,[63] when denying jurisdiction over an American citizen's in rem claim to a French warship, placed weight on "the consideration [] that the sovereign power of the nation is alone competent to avenge wrongs committed by a sovereign, that the questions to which such wrongs give birth, are rather questions of policy than of law, that they are for diplomatic, rather than legal discussion. . . ."[64] Later, in United States v. Lee,[65] the Court, referring to litigation attempting subjection of property of foreign countries found within domestic territory, declared that "it has been uniformly held that these were questions, the decisions of which . . . must be primarily dealt with by those departments of the government which had the power to adjust them by negotiation,"[66] and that "[i]n such cases the judicial department of this government follows the action of the political branch. . . ."[67] Still later, in Underhill v. Hernandez,[68] the Court, in holding that the Judicial Branch cannot entertain damage claims by American citizens against officials of a recognized foreign power, admonished that "the courts of one country will not sit in judgment on the acts of the government of

judicial approbation without any intimation whatever that a problem of unlawful extradition had been courted. See cases cited *supra* note 32.

60. See text *supra* at note 14.

61. Chinese Exclusion Case (Chae Chan Ping v. United States), 130 U.S. 581, 602, 9 S.Ct. 623, 32 L.Ed. 1068 (1889) (statute barring entry of Chinese laborers into United States, which contravened prior treaties with China) ; Botiller v. Dominguez, 130 U.S. 238, 247, 9 S.Ct. 525, 32 L.Ed. 926 (1889) (obligation to protect property rights of Mexicans) ; Whitney v. Robertson, 124 U.S. 190, 194–195, 8 S.Ct. 456, 31 L.Ed. 386 (1888) (obligation to equalize duties on imports from San Domingo) ; Head Money Cases (Edye v. Robertson), 112 U.S. 580, 597–599, 5 S.Ct. 247, 28 L.Ed. 798 (1884) (per capita tax on immigrants, assertedly violative of treaties with friendly countries) ; The Cherokee Tobacco (Boudinot v. United States), *supra* note 49, 78 U.S. (11 Wall.) at 621, 20 L.Ed. 227 (statute taxing tobacco, conflicting with prior treaty with Cherokee Nation) ; United States v. Ferreira, 54 U.S. (13 How.) 40, 46, 48, 14 L.Ed. 42 (1851) (obligation to compensate Spanish officers and inhabitants for injuries sustained during Florida campaign). See also United States v. Sandoval, 167 U.S. 278, 290, 293–294, 298, 17 S.Ct. 868, 42 L.Ed. 168 (1897).

62. Ex parte Peru, 318 U.S. 578, 588–589, 63 S.Ct. 793, 87 L.Ed. 1014 (1943) ; Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897) ; United States v. Lee, 106 U.S. 196, 209, 1 S.Ct. 240, 27 L.Ed. 171 (1882) ; Schooner Exchange v. McFadden, *supra* note 35, 11 U.S. (7 Cranch) at 146, 3 L.Ed. 287.

63. *Supra* note 35.

64. 11 U.S. (7 Cranch) at 146, 3 L.Ed. 287.

65. *Supra* note 62.

66. 106 U.S. at 209, 1 S.Ct. at 251.

67. *Id.*

68. *Supra* note 62.

another, done within its own territory," [69] and that "[r]edress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves." [70] And in 1943, in Ex parte Peru,[71] where a steamship solely owned by a foreign state was libeled for alleged breach of a charter party, the Court, entertaining a mandamus proceeding having in view the release of the ship, reiterated "the court's duty to surrender the vessel and remit the libelant to the relief obtainable through diplomatic negotiations," [72] and declared "that our national interest will be better served in such cases if the wrongs to suitors, involving our relations with a friendly foreign power, are righted through diplomatic negotiations rather than by the compulsions of judicial proceedings." [73]

That the doctrine espoused in these cases controls the one at bar can hardly be gainsaid.[74] Indeed, it has seen specific application in a situation closely approximating that now before us. In Charlton v. Kelly,[75] an American citizen fought extradition from the United States to Italy pursuant to a treaty in terms requiring each government to deliver up persons within its borders, including its own citizens, when charged as fugitives from prosecution under specified laws of the other. Claim was made that the extradition treaty was not binding on the United States because Italy had refused to honor it whenever surrender of an Italian citizen was demanded. Notwithstanding a firm showing that such was the fact,[76] the Supreme Court held that the objection to extradition could not prevail:

If the attitude of Italy was, as contended, a violation of the obligation of the treaty, which, in international law, would have justified the United States in denouncing the treaty as no longer obligatory, it did not automatically have that effect. If the United States elected not to declare its abrogation, or come to a rupture, the treaty would remain in force. It was only voidable, not void; and if the United States should prefer, it might waive any breach which, in its judgment, had occurred, and conform to its own obligation as if there had been no such breach. . . .

The Executive Department having thus elected to waive any right to free itself from the obligation to deliver up its own citizens, it is the plain duty of this court to recognize the obligation to surrender the appellant as one imposed by the treaty as the supreme law of the land, and as affording authority for the warrant of extradition.[77]

We are mindful of the consideration that while a treaty is primarily a political compact between sovereigns,[78] it "may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in

69. 168 U.S. at 252, 18 S.Ct. at 84.

70. *Id.*

71. *Supra* note 62.

72. 318 U.S. at 588, 63 S.Ct. at 800.

73. *Id.* at 589, 63 S.Ct. at 800.

74. See also Luftig v. McNamara, 126 U.S. App.D.C. 4, 5–6, 373 F.2d 664, 665–666, cert. denied, 387 U.S. 945, 87 S.Ct. 2078, 18 L.Ed.2d 1332 (1967).

75. 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913).

76. That was established by an exchange of correspondence between the two nations, set forth in the Court's opinion. 229 U.S. at 470–472, 33 S.Ct. 945.

77. 229 U.S. at 473, 476, 33 S.Ct. at 954, 955.

78. Rainey v. United States, 232 U.S. 310, 316, 34 S.Ct. 429, 58 L.Ed. 617 (1914); Charlton v. Kelly, *supra* note 75, 229 U. S. at 474, 33 S.Ct. 945; B. Altman & Co. v. United States, 224 U.S. 583, 600, 32 S.Ct. 593, 56 L.Ed. 894 (1912); Fourteen Diamond Rings v. United States, 183 U.S. 176, 182, 22 S.Ct. 59, 46 L.Ed. 138 (1901); Whitney v. Robertson, *supra* note 61, 124 U.S. at 194, 8 S.Ct. 456; Head Money Cases (Edye v. Robertson), *supra* note 61, 112 U.S. at 598, 5 S.Ct. 247, 28 L.Ed. 798.

the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the country." [79] We also recognize that in the domestic realm courts are not only equipped to enforce self-executing treaties affecting individual rights, but by virtue of the Supremacy Clause [80] are required to do so.[81] We see no room, however, for operation of these principles when the corrective machinery specified in the treaty itself is nonjudicial. That appears the clearer from Johnson v. Eisentrager,[82] which held that federal courts lacked habeas corpus jurisdiction to inquire into war-crimes trials by an American military commission in China of nonresident enemy aliens captured there. The Court stated that the prisoners were entitled to the protection of the Geneva Convention [83] but pointed out that "the obvious scheme of the Agreement [is] that responsibility for observance and enforcement of these rights is upon political and military authorities," [84] and that "[r]ights of alien enemies are vindicated under it only through protests and intervention of protecting powers as the rights of our citizens against foreign governments are vindicated only by Presidential intervention." [85]

The same result is plainly dictated here, where appellants trace the rights they claim to the provisions of an international agreement the enforcement mechanism of which is diplomatic recourse only. NATO SOFA, which makes provision of the rights claimed, is explicit that "[a]ll differences between the Contracting Parties relating to the interpretation or application of this Agreement shall be settled by negotiation without recourse to any outside jurisdiction." [86] Therein lies also the answer to appellants' contention that judicial redress of their grievances is called for by the international standard of justice, for "[t]here is no power in this Court to declare null and void a . . . declaration included in a treaty merely on the ground that such provision violates a principle of international law." [87] In sum, intervention by an American court into the matters of which appellants complain is foreclosed by the very terms of the document from which the rights insisted upon are said to spring.[88]

79. Head Money Cases (Edye v. Robertson), *supra* note 61, 112 U.S. at 598, 52 S.Ct. at 254. See also Whitney v. Robertson, *supra* note 61, 124 U.S. at 192–195, 8 S.Ct. 456. A prominent example is a treaty conferring inheritance rights on aliens. See Kolovrat v. Oregon, 366 U.S. 187, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961) ; Clark v. Allen, *supra* note 26.

80. "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S.Const., art. VI, cl. 2.

81. Maiorano v. Baltimore & O. R. R., 213 U.S. 268, 272–273, 29 S.Ct. 424, 53 L.Ed. 792 (1909) ; Whitney v. Robertson, *supra* note 61, 124 U.S. at 194, 8 S.Ct. 456; United States v. Rauscher, *supra* note 59, 119 U.S. at 418, 7 S.Ct. 234; Head Money Cases (Edye v. Robertson), *supra* note 61, 112 U.S. at 598–599, 5 S.Ct. 247; Strother v. Lucas, 37 U.S. (12 Pet.) 410, 438, 9 L.Ed. 1137 (1838).

82. 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950).

83. Convention With Other Powers Relating to Prisoners of War, July 27, 1929, 47 Stat. 2021 (1932) (effective Aug. 4, 1932).

84. 339 U.S. at 789 n. 14, 70 S.Ct. at 949.

85. *Id.*

86. NATO SOFA, *supra* note 3, art. XVI.

87. Tag v. Rogers, 105 U.S.App.D.C. 387, 389, 267 F.2d 664, 666 (1959).

88. We note also that the "sense of the Senate" reservations upon its ratification of NATO SOFA, *infra* Part VI, point to diplomatic channels exclusively, and that the Defense Department's implementing regulations, *infra* Part VI. follow suit exactly.

## VI

We think the doctrinal considerations discussed herein apply full force to the case at bar. We think, too, that they rebut appellants' argument in each of its facets. And it goes without saying that the relevant law enunciated by the Supreme Court—as in overwhelming measure it is here—is controlling on this court. We caution, however, that we do not say that appellants' claims of trial unfairness are unworthy of executive scrutiny; on that score, we make no adjudication one way or the other. What we decide, and all we decide, is that those claims cannot be vindicated by the process appellants have solicited.

To Americans, steeped in a long and unique tradition of criminal-trial fairness, the prospect of a foreign prosecution under less protective standards is disturbing.[89] That is the more so where the accused did not tread on foreign soil by choice, but rather in consequence of military assignment in the service of his country.[90] Perhaps the zenith of discomfort is reached when, as here, serious deprivations of fair-trial entitlements under an applicable treaty are judicially

asserted,[91] and governmental litigants in position to know do not specifically deny the charges, whether technically required to do so or not.[92]

We are not the first to express concern. Nearly two decades ago, when ratification of NATO SOFA was pondered in the Senate, apprehensions over the subjection of American servicemen to criminal procedures variant from our own were strongly voiced.[93] Indeed, an unsuccessful effort to condition ratification upon extraterritoriality for American troops abroad drew the support of a full third of the members voting.[94] What seemingly carried the day for unconditional ratification[95] was a feeling, not that the fears expressed were completely unfounded, but that on balance NATO SOFA was a decided improvement over existing international arrangements and any others that could realistically be envisioned.[96]

More significantly, ratification of NATO SOFA was forthcoming only with a resolution expressing reservations— "the sense of the Senate"[97]—in the form of procedures to accompany foreign criminal trials of American servicemen.[98]

---

89. Compare Gallina v. Fraser, *supra* note 58, 278 F.2d at 79.

90. See Cox v. Wood, 247 U.S. 3, 38 S.Ct. 421, 62 L.Ed. 947 (1918); Selective Draft Law Cases (Arver v. United States), 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (1918). See also Johnson v. Eisentrager, *supra* note 82, 339 U.S. at 789, 70 S.Ct. 936; Lichter v. United States, 334 U.S. 742, 756, 68 S.Ct. 1294, 92 L. Ed. 1694 (1948).

91. See text *supra* at note 21.

92. We are told merely that on review of the report of an American observer at appellants' trial, the Department of the Army determined that the trial was fair. From this we may assume at least some disagreement with appellants' account.

93. The debates appear at 99 Cong.Rec. 4659–74, 8724–82, 8835–45 (1953). See also Schwartz, *supra* note 33, at 1092–93.

94. See 99 Cong.Rec. 8782 (1953).

95. The Senate resolutions did not condition the ratification of NATO SOFA since the

reservations were obviously not designed to affect the text or terms of the treaty or the relations of the parties thereunder. See Fourteen Diamond Rings v. United States, *supra* note 78, 183 U.S. at 180, 182, 183, 22 S.Ct. 59; New York Indians v. United States, 170 U.S. 1, 22–23, 18 S.Ct. 531, 42 L.Ed. 927 (1898). *Cf.* Power Authority of New York v. FPC, 101 U.S.App.D.C. 132, 247 F.2d 538, vacated as moot sub nom. American Power Ass'n v. Power Authority of New York, 355 U.S. 64, 78 S.Ct. 141, 2 L.Ed. 2d 107 (1957).

96. The views stated by proponents of ratification parallel those advanced in the Report of the Senate Committee on Foreign Relations. Exec.Rept. No. 1, 83d Cong. 1st Sess. (1953).

97. See note 98, *infra*.

98. The resolution provides:
In giving its advice and consent to ratification, it is the sense of the Senate that:
1. The criminal jurisdiction provisions of Article VII do not constitute a precedent for future agreements;

Prior to trial, the laws of the prosecuting nations are to be examined by the commanding officer of the armed forces "with particular reference to the procedural safeguards contained in the Constitution of the United States." [99] If the commanding officer is of the view that "there is danger that the accused will not be protected because of the absence or denial of constitutional rights he would enjoy in the United States," he must request a waiver of foreign jurisdiction and, if refused, must "request the Department of State to press such request through diplomatic channels." [100] As a further step, an American representative is to observe the trial and report any noncompliance with NATO SOFA's fair-trial guaranties [101] to the commanding officer, who in turn must then "request the Department of State to take appropriate action to protect the rights of the accused." [102] To these supplications are added similar specifications in regulations of the Department of Defense promulgated in pursuance of its "policy . . . to protect, to the maximum extent possible, the rights of United States personnel who may be subject to criminal trial by foreign courts and imprisonment in foreign prisons." [103]

This litigation, however, as cast in the District Court, made no call for an investigation of claims that American authorities were remiss in the discharge of any such obligations owing to appellants. The case was not pitched on alleged deficiencies of that character, nor was relief demanded on that account. Instead, appellants' complaint, as amended, was directed almost exclusively toward the asserted shortcomings in their West German trial,[104] and the declaration and

---

2. Where a person subject to the military jurisdiction of the United States is to be tried by the authorities of a receiving state, under the treaty the commanding officer of the Armed Forces of the United States in such state shall examine the laws of such state with particular reference to the procedural safeguards contained in the Constitution of the United States;

3. If, in the opinion of such commanding officer, under all the circumstances of the case, there is danger that the accused will not be protected because of the absence or denial of constitutional rights he would enjoy in the United States, the commanding officer shall request the authorities of the receiving state to waive jurisdiction in accordance with the provisions of paragraph 3(c) of article VII (which requires the receiving state to give "sympathetic consideration" to such request), and if such authorities refuse to waive jurisdiction, the commanding officer shall request the Department of State to press such request through diplomatic channels and notification shall be given by the executive branch to the Armed Services Committees of the Senate and House of Representatives.

4. A representative of the United States to be appointed by the Chief of Diplomatic Mission with the advice of the senior United States military representative in the receiving state will attend the trial of any such person by the authorities of a receiving state under the agreement, and any failure to comply with the provisions of paragraph 9 of article VII of the agreement shall be reported to the commanding officer of the Armed Forces of the United States in such state who shall then request the Department of State to take appropriate action to protect the rights of the accused, and notification shall be given by the executive branch to the Armed Services Committees of the Senate and House of Representatives.

99 Cong.Rec. 8780 (1953).

99. See note 98, *supra*.

100. See note 98, *supra*.

101. See text *supra* at note 14.

102. See note 98, *supra*.

103. Status of Forces Policies, Procedures, and Information, Departments of the Air Force, the Army, and the Navy, AFR 110–12, AR 27–50, SECNAVINST 5820.4c, June 28, 1967.

104. Such was the thrust of the pleadings. No transcript of the oral argument in the District Court appears in the record on appeal.

the injunctions they sought would have had the effect only of thwarting their surrender to the Federal Republic.[105] And while appellants' contentions have broadened considerably on appeal, a judicial barring of the surrender remains their single objective. That, as we have said, is an area in which we cannot intrude.

Our duty is to decide the controversy as presented. Accordingly, we do not reach the question whether the Senate reservations [106] or the Defense Department's implementing regulations might have supported another approach.[107] Nor do we pass upon appellants' contention that their sentences unjustly deprive them of their liberty, but simply note that such a claim has long been addressable to the President.[108] Our holding is that in the circumstances here the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court.

The judgment of the District Court is

Affirmed.

---

105. See note 23, *supra*.

106. See Schwenk, Comparative Study of the Law of Criminal Procedure in NATO Countries Under the NATO Status of Forces Agreement, 35 N.C.L.Rev. 358 (1957).

107. This is not to suggest that the judicial process could in any event be invoked to compel diplomatic activity in appellants' behalf. See United States ex rel. Keefe v. Dulles, 94 U.S.App.D.C. 381, 384–385, 222 F.2d 390, 393–394 (1954), cert. denied, 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 743 (1955). But under both the Senate resolution and the Department's regulations, a request from the commanding officer sets diplomatic machinery in motion and, despite appellants' claims, no such request was made here. There may, of course, be good reason for this, but if so it has not emerged during this litigation.

108. 22 U.S.C. § 1732 (1964) provides: Whenever it is made known to the President that any citizen of the United

States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

See also Zemel v. Rusk, 381 U.S. 1, 15, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Worthy v. Herter, 106 U.S.App.D.C. 153, 158, 270 F.2d 905, 910, cert. denied, 361 U.S. 918 (1959).